RTP:NR/FTB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

RICHARD ZAVADA,
PATRICK MCCRANN,
DEVRAJ BALBIR,
    also known as "Dev,"
RICARDO GARCIA,
    also known as "Rick," and
JEVAN SEEPAL,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(18 U.S.C. § 1952(a)(3)(A))

Case No. 21 MJ 696 (MMH)

EASTERN DISTRICT OF NEW YORK, SS:

      KENNETH HOSEY, being duly sworn, deposes and says that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), and alleges as follows:

      In or about and between July 2013 and July 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants RICHARD ZAVADA, PATRICK MCCRANN, DEVRAJ BALBIR, also known

as "Dev," RICARDO GARCIA, also known as "Rick," and JEVAN SEEPAUL, together

with others, did knowingly and intentionally use one or more facilities in interstate and

foreign commerce, to wit: one or more cellular telephones, with intent to promote, manage,

establish, carry on and facilitate the promotion, management, establishment and carrying on,

of one or more unlawful activities, to wit: commercial bribe receiving in the second degree,

in violation of New York Penal Law Section 180.05,[1] and thereafter performed acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of such unlawful activity.

(Title 18, United States Code, Section 1952(a)(3)(A))

1.      I am a Special Agent with the FBI and have been so for 26 years.   I have been involved in the investigation of numerous cases involving fraud and corruption, including corruption involving public officials and bribery.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file and from reports of other law enforcement officers involved in the investigation.   Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

I.      Relevant Parties

2.      The defendants RICHARD ZAVADA, PATRICK MCCRANN, DEVRAJ BALBIR, RICARDO GARCIA, and JEVAN SEEPAUL were employed by a publicly traded utilities company that operates in multiple states, including New York (the "Company").

3.      Throughout the time period relevant to this Complaint, the Company entered into contracts with various entities to maintain the Company's facilities throughout

---

[1]     New York Penal Law 180.05 provides that "[a]n employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs."   New York Penal Law Section 180.05 is a Class A misdemeanor.

New York.   Performance of these contracts was overseen by the Company's Facilities department (the "Facilities Department").   Among the entities with which the Company contracted for maintenance services were two companies, owned by the same individuals, based in Long Island, New York (collectively, the "Contractor").

4.      The defendant RICHARD ZAVADA was employed in the Facilities Department of the Company or the Company's predecessor entities for approximately 33 years.   At certain times relevant to the Complaint, ZAVADA was responsible for managing the Company's facilities in Long Island.

5.      The defendant PATRICK MCCRANN was employed in various capacities at the Company or its predecessor entities for approximately 37 years and served as a manager in the Facilities Department.   MCCRANN retired from the Company in or about January 2019.   MCCRANN was responsible for managing the Company's facilities in New York City and Long Island until his retirement.

6.      The defendant DEVRAJ BALBIR, also known as "Dev," was employed as a manager in the Facilities Department for approximately five years.

7.      The defendant RICARDO GARCIA, also known as "Rick," was employed in various capacities at the Company, including as a manager in the Facilities Department.   GARCIA was employed for the Company for approximately 28 years.   From approximately 2018 through 2020, GARCIA was responsible for managing the Company's facilities in New York City and Long Island.

8.      The defendant JEVAN SEEPAUL was employed as manager in the Facilities Department between in or about October 2014 and November 2017.

9.    Cooperating Witness 1 ("CW-1") was an owner of the Contractor.[2]

10.    Cooperating Witness 2 ("CW-2") was an owner of the Contractor.[3]

11.    Cooperating Witness 3 ("CW-3") was a vendor to the Company.[4]

II.    Overview

12.    In January 2020, the FBI received information that, in the aftermath of Hurricane Sandy in October 2012, CW-1 and CW-2 paid bribes on behalf of the Contractor to various representatives of the Company in order to receive work from the Company.   As set forth below, the investigation has identified evidence that the defendants RICHARD ZAVADA, PATRICK MCCRANN, DEVRAJ BALBIR, RICARDO GARCIA, and JEVAN SEEPAUL solicited and received bribe payments from CW-1, CW-2, and other vendors of

---

[2]    CW-1 began cooperating with law enforcement in or about July 2020.   CW-1 subsequently pleaded guilty to a federal felony charging him/her with paying and/or directing others to pay bribes to employees of the Company.   CW-1 is cooperating in hopes of receiving leniency when CW-1 is sentenced.   Information provided by CW-1 has proven reliable and has been independently corroborated by, among other things, financial records, toll records, text messages, consensually recorded conversations, and information provided by other witnesses.

[3]    CW-2 began cooperating with law enforcement in or about July 2020.   CW-2 subsequently pleaded guilty to a federal felony charging him/her with paying and/or directing others to pay bribes to employees of the Company.   CW-2 is cooperating in hopes of receiving leniency when CW-2 is sentenced.   Information provided by CW-2 has proven reliable and has been independently corroborated by, among other things, financial records, toll records, text messages, consensually recorded conversations, and information provided by other witnesses.

[4]    CW-3 began cooperating with law enforcement in or about July 2017.   CW-3 previously pleaded guilty to a federal felony charging CW-3 with conduct unrelated to the Company.   CW-3 is cooperating in hopes of receiving leniency when CW-3 is sentenced. Since beginning his/her cooperation, information provided by CW-3 has proven reliable and has been independently corroborated by, among other things, financial records, toll records, text messages and information provided by other witnesses.   However, when first asked about bribe payments to representatives of the Company, CW-3 denied such payments. CW-3 later acknowledged having paid bribes as described in greater detail below.

the Company.   Notably, between December 2014 and February 2020, the Contractor received more than $50 million in payments from the Company.

13.     In or about July 2020, CW-1 and CW-2 began cooperating with the government's investigation, including meeting with FBI special agents on several occasions. CW-1 and CW-2 admitted having made bribe payments to the defendants to secure work from the Company and to receive other favorable treatment for the Contractor relating to its work at the Company.   This favorable treatment included, but was not limited to, the following: providing non-public information about competitors' bids; awarding no-bid contracts,[5] structuring the value of contracts to avoid additional approval requirements and providing favorable performance reviews.

14.     CW-1 and CW-2 further acknowledged that they continued to pay bribes for fear that, in the absence of such payments, the defendants could harm the Contactor's ability to continue to do work for the Company.   Additionally, the defendants, MCCRANN, GARCIA (subsequent to May 1, 2019) and BALBIR (subsequent to May 1, 2020), had the authority to approve "no-bid" contracts valued at less than $50,000 and could elect to use the Contractor's competitors in the absence of the requested bribes.   Further, each of the defendants had the authority to slow or stop disbursement of project funds to the Contractor, provide negative performance reviews regarding the Contractor's work or otherwise claim that the Contractor's work did not meet contractual specifications.   As such,

---

[5]     The Company permitted certain field supervisors to approve contracts for projects projected to be under $50,000 to a pre-approved set of vendors without seeking competitive bids.   After the projects were awarded, the field supervisors, regardless of their authority to approve projects under $50,000, facilitated disbursement of project funds, monitored the progress of the projects and provided feedback to Company representatives who were in position to award future projects.

each of the defendants was in a position to cause significant economic harm to Company vendors, such as the Contractor, who failed to pay the kickbacks they demanded.

15.     CW-1 and CW-2 often communicated with the defendants regarding these bribe payments via cellular telephone and text messages.   As detailed below, these bribe payments took the form of cash, vehicles, tuition payments, home renovations, personal electronic devices, travel and vacation expenses and other items of value.

III.    The Defendants' Bribery Schemes

16.     According to CW-1, in or about 2013, CW-1 and CW-2 established the Contractor and subsequently began submitting bids to perform work for the Company.   In or about 2014 or 2015, both ZAVADA and MCCRANN indicated to CW-1 that ZAVADA and MCCRANN were unhappy with a vendor ("Vendor-1") who had performed work for the Company, including telling CW-1 that Vendor-1 had been "screwing them over."   Based on these conversations, CW-1 suspected Vendor-1 had been making bribe payments to MCCRANN and ZAVADA.   CW-1's suspicions were confirmed during a series of meetings with ZAVADA.   During the meetings, ZAVADA indicated he had an agreement with Vendor-1 pursuant to which ZAVADA would receive a kickback of 5% of the total payments that Vendor-1 received for all jobs performed for the Company in which ZAVADA was involved.

17.     When the Contractor began performing work for the Company that ZAVADA supervised, ZAVADA made clear to CW-1 that he (ZAVADA) could elect to use vendors, other than the Contractor, to perform work for the Company.   Similarly, CW-2 recalled that, while at a Company job site located in Hicksville, New York, MCCRANN indicated to CW-1 and CW-2 that he wanted to receive a kickback of 7% of the payments

that the Contractor received from the Company.[6]

18.    CW-1 and CW-2 understood ZAVADA, MCCRANN, and the other Company supervisors had the authority to select any approved Company vendor, without relying on a bidding process, for contracts valued at less than a certain amount ($50,000). CW-1 and CW-2 further understood, based on their conversations with ZAVADA and MCCRANN, that ZAVADA, MCCRANN and other Company supervisors could make the performance of their job and the receipt of payment from the Company very difficult for the Contractor if the bribes they sought were not paid.[7]   As such, CW-1 and CW-2 agreed to make bribe payments to ZAVADA, MCCRANN and, ultimately also to BALBIR, GARCIA, and SEEPAUL.

19.    Similarly, when interviewed by FBI special agents, Vendor-1 also acknowledged that, in the aftermath of Hurricane Sandy, both ZAVADA and MCCRANN had solicited cash bribe payments from his/her company.   In reference to MCCRANN, Vendor-1 stated, in substance, that given MCCRANN's position at the Company, MCCRANN could have "made life miserable" for Vendor-1.   Vendor-1 agreed to make the bribe payments demanded by ZAVADA and MCCRANN.

20.    In addition, CW-3, who was also a vendor for the Company during the relevant time period, acknowledged to FBI special agents that CW-3 paid cash bribes to both ZAVADA and MCCRANN.   CW-3 recalled having initiated the payments to MCCRANN

---

[6]    CW-1 and CW-2 did not ultimately pay the 7% amount; rather, they paid payments in the amounts discussed below.

[7]    For instance, CW-2 informed agents that a Company supervisor could do significant financial harm to the Contractor financially by, for instance, citing a minor safety infraction as a basis to substantially delay or halt work on a job site.

by providing him an envelope containing approximately $5,000 in cash at a location in Brentwood, New York.   In response, MCCRANN said, in substance, "You don't have to do that."   CW-3 replied, in substance, "I appreciate the help."   CW-3 stated that, although CW-3 believed that neither ZAVADA nor MCCRANN determined which vendor received Company contracts, they provided vendors with a "good report card" or a "bad report card." For example, CW-3 indicated if a vendor had an accident at a job site, ZAVADA and MCCRANN were the Company representatives responsible for assessing the Company's response.   CW-3 also understood both ZAVADA and MCCRANN had influence with the Company representatives who awarded contracts.

21.    CW-1 also understood that, on certain occasions, ZAVADA, MCCRANN, and GARCIA awarded projects over the $50,000 threshold to the Contractor by dividing the project into smaller units or by dividing the project between other departments of the Company.

IV.    The Defendants' Communications with the Contractor

22.    Each of the defendants repeatedly communicated with CW-1 or CW-2, via text message, to solicit bribes payments from the Contractor while the Contractor was performing work for the Company.   The communications below reflect a non-exhaustive sample of those communications:

a.    RICHARD ZAVADA

23.    On or about March 29, 2017, ZAVADA and CW-1 had the following exchange:

ZAVADA:    Do you need the wiring information or RV [recreational vehicle] number?
CW-1:    The phone number of rv shop.

ZAVADA:      The number is [phone number of recreational vehicle dealership]

24.      Based on my knowledge of the investigation to date, including my discussions with CW-1, I believe that, here, ZAVADA wanted CW-1 to purchase a recreational vehicle ("rv") for ZAVADA and asked CW-1 how CW-1 was going to pay for the purchase ("Do you need the wiring information").   CW-1 told FBI special agents that he had purchased more than one recreational vehicle as a bribe payment to ZAVADA.

25.      On or about December 2, 2018, ZAVADA and CW-1 had the following text message exchange:

ZAVADA:      Who was it you spoke too? They have me in a Cottage??? Im on hold
CW-1:          They said that was the best accommodation and guarantees the king beds

26.      Based on the investigation to date, including my discussions with CW-1, I believe that, here, ZAVADA and CW-1 were communicating about hotel accommodations the Contractor had made and paid for on behalf of ZAVADA.   I further believe the communication reflects ZAVADA's dissatisfaction with the accommodations. Bank records and records obtained from the Contractor further reflect that CW-1 arranged and paid for ZAVADA's travel to various locations including an overseas vacation.

27.      On or about February 13, 2020, ZAVADA sent CW-1 a text message which read: "Can you please pay this thank You."   Attached to the text message was an image of invoice from a landscaping company for $1,710.77 for work performed at ZAVADA's residence.   Here, I believe ZAVADA requested that CW-1 pay ZAVADA's personal expenses – landscaping work at ZAVADA's residence.   CW-1 advised this was one of many personal expenses paid for by the Contractor as a bribe to ZAVADA.

28.      On or about August 27, 2020, CW-1, acting at the direction of FBI

special agents, consensually recorded his/her meeting with ZAVADA which occurred at

ZAVADA's residence in Long Island, New York.   I have reviewed the recording and

discussed the meeting with CW-1.   During the meeting, CW-1 discussed the amount of

money ZAVADA claimed the Contractor "owed" ZAVADA for work performed for the

Company.   When CW-1 questioned ZAVADA's calculation, ZAVADA asked CW-1, "Who

are you?" and indicated, in sum, substance and part that CW-1 was not in a position to

question ZAVADA.   ZAVADA further stated, in sum, substance and part that he had

referred CW-1 work for the Contractor from clients other than the Company.   ZAVADA

indicated he had been very fair and frugal with CW-1 in his calculations and was not seeking

money for all the other (non-Company) work that ZAVADA had referred to CW-1.

29.   During the same conversation, ZAVADA made clear he would

withhold payments due from the Company to the Contractor if CW-1 did not make the

requested payments.   ZAVADA stated that, due to changes taking place at the Company, "I

need to cash in and cash out.   Tomorrow they may give me the (expletive) boot."

ZAVADA ultimately told CW-1 that he (ZAVADA) would "work" with CW-1 on the

amount that ZAVADA expected to receive from the Contractor.

30.   On November 18, 2020, FBI special agents executed a search warrant

on ZAVADA's residence in Long Island, New York.[8]   Among the items seized during the

search were electronic spreadsheets maintained by ZAVADA that contained dates, the

amounts of bribe payments, and the names of various entities which provided facilities

services to the Company.   Among the entities identified in the spreadsheets was the

---

[8]   On the same day, agents also recovered approximately $300,000 in cash from a safe
deposit box held by ZAVADA.

Contractor.   Based on the spreadsheets and the August 27, 2020 meeting between CW-1 and

ZAVADA described above, I believe that ZAVADA had calculated that he was "owed"

more than $100,000 from the Contractor relating to work performed for the Company in

2018 and more than $200,000 for work performed in 2019.

       31.    In addition, the spreadsheets listed multiple other Company vendors

from whom ZAVADA received bribe payments.   The spreadsheets included payments

received from Vendor-1 and an entity controlled by CW-3.   Vendor-1 did not recall the

specific bribe amounts paid to each individual but estimated having paid approximately

$10,000 to ZAVADA and a significantly larger sum to MCCRANN.   However, records of

bribe payments maintained by ZAVADA appear to reflect that Vendor-1's payments to

ZAVADA were substantially greater than $10,000.

     b.  <u>PATRICK MCCRANN</u>

       32.    The defendant PATRICK MCCRANN regularly communicated with

CW-1 via text message to arrange the receipt of cash bribes.   According to CW-1, he/she

and MCCRANN used coded language in the communications, referring to the cash bribes as

various food items received from "Mary."   For example:

       33.    On or about September 2, 2016, MCCRANN and CW-1 had the

following text message exchange:

      MCCRANN:  Sandwich was light on the meat
      CW-1:       She's working on it
      MCCRANN:  K a little concerned as Mary always make a great sandwich
      MCCRANN:  Have a great weekend
      CW-1:       I rushed her but I'll ask for a nice one next time

       34.    Based on my knowledge of the investigation, including my discussions

with CW-1, I believe MCCRANN was indicating to CW-1 that a recent bribe payment was

insufficient ("Sandwich was light on the meat" and he was "a little concerned.").   I further

believe CW-1 was indicating the next bribe payment would be larger ("I'll ask for a nice one

next time").

35.   On or about November 17, 2016, MCCRANN and CW-1 had the

following text message exchange:

CW-1:   Hey forgot to ask any updates with [facility belonging to the Company] drainage?
MCCRANN:   I'll check with Mary and get back to you
CW-1:   I'm almost positive she's available tomorrow[.] She's supposed to confirm this afternoon
MCCRANN:   Great

36.   Based on the investigation to date, including my conversations with

CW-1, I believe CW-1 was inquiring about the status of a project for the Company.

However, MCCRANN responded with a reference to "Mary."   As such, I believe that

MCCRANN's willingness to assist the Contractor with the project was dependent on his

receipt of a bribe payment ("I'll check with Mary and get back to you").   CW-1 agreed to

pay promptly ("I'm almost positive she's available tomorrow[.] She's supposed to confirm

this afternoon").

37.   On or about January 26, 2017, MCCRANN and CW-1 had the

following text message exchange:

MCCRANN:   How is my friend [M]ary – maybe she would like to tour garden city
CW-1:   She's been good
MCCRANN:   She needs to step it up.

38.   Based on the above, I believe that MCCRANN was requesting another

cash bribe from the Contractor ("How is my friend [M]ary") and further indicating the

Contractor needed to provide a bribe in the near future ("She needs to step it up").   I further

understand these communications reflect MCCRANN's practice of linking his requests for bribe payments with references to potential work for the Company ("tour garden city").

39.     As part of the investigation, the FBI interviewed an individual who performed sub-contracting work for the Contractor ("Sub-Contractor-1").   Sub-Contractor-1 stated CW-2 had previously asked him/her for cash, which Sub-Contractor-1 provided in exchange for checks issued by the Contractor to one of Sub-Contractror-1's businesses. Sub-Contractor-1 understood from his/her conversations with CW-2 that some of the cash s/he provided to CW-2 was used for the payment of bribes to representatives of the Company.

40.     Sub-Contractor-1 recalled a specific instance in which CW-2 requested $5,000 in cash at a time when Sub-Contractor-1 was performing work for the Contractor at a Company jobsite.   CW-2 informed Sub-Contractor-1 that the money was for "McCrann." After having obtained the cash, CW-2 instructed Sub-Contractor-1 to leave it in CW-1's vehicle, which was parked at the jobsite.   Shortly thereafter, Sub-Contractor-1 observed CW-1 and MCCRANN enter CW-1's vehicle and leave approximately 15 minutes later.

41.     As part of the investigation, the FBI interviewed another individual ("Employee-1") who served as an employee of the Contractor at the time that CW-1 and CW-2 were making bribe payments to MCCRANN and the other defendants.   Employee-1 stated that, while s/he was working in the Contractor's office, s/he heard CW-1 state, in sum, substance and part, that "Pat called and asked if MaryJane was working at the deli." CW-1 explained to Employee-1 that "MaryJane" was a reference to cash payments made to MCCRANN.   Employee-1 understood that these payments were being made to MCCRANN in connection with MCCRANN's work at the Company.

42.    CW-1 and CW-2 also paid for renovations made to MCCRANN's home in Upstate New York.   CW-2 provided a copy of a document CW-2 had received from MCCRANN relating to the renovations.   The renovations were paid for with two checks: one in the amount of $40,000 issued on or about September 10, 2018, and another in the amount of $50,000 issued on or about November 14, 2018.   The checks were issued from bank accounts controlled by the Contractor but not in the name of the Contractor's primary business.

43.    As part of the investigation, the vendor who performed the work on MCCRANN's home in Upstate New York was interviewed by the FBI.   The vendor confirmed having received two third-party checks from MCCRANN as payment for the work.   The vendor believed MCCRANN told him/her that MCCRANN was paying with third-party checks because MCCRANN was owed money for (non-Company) contracting work MCCRANN had purportedly performed.   When interviewed by FBI special agents, on September 2, 2020, MCCRANN claimed the $40,000 and $50,000 checks were loans that he received from CW-1.   MCCRANN has not produced any documents in support of his claim the $40,000 and $50,000 checks were loans from CW-1 and CW-1 has confirmed that the payments were not loans.

44.    Employee-1 also informed agents that in or about March 2018, the Contractor bid on a paving contract at a Company facility in Suffolk County, New York. During the bid process, Employee-1 attended a meeting in CW-1's office during which CW-1 displayed an Excel spreadsheet on a screen.   Employee-1 recalled the spreadsheet having contained line item pricing for concrete, asphalt, and other items.   During the meeting, CW-1 told Employee-1 the spreadsheet had been obtained from MCCRANN.   Employee-1

understood the spreadsheet to contain the competitor's bid information for the paving

project.   The Contractor was ultimately awarded the contract.[9]

        45.     Similarly, on or about April 10, 2017, MCCRANN and CW-1 had the

following text message exchange regarding a separate project:

    MCCRANN:  Your [sic] at 305 [Competitor] is 225 No can do 80 k diff no way
    CW-1:       Ok let me talk with [an associate]
    MCCRANN:  Quick Not even close at this point Need to get within 25

        46.     Based on the above, I believe that MCCRANN was advising CW-1 the

Contractor's bid for a project with the Company was $80,000 higher than a competitor's bid

and that, with such a large difference, the Contractor would not win the bid ("No can do 80

K diff no way").   I further believe MCCRANN was advising CW-1 that the Contractor's

bid had to be within $25,000 of the competitor's bid to be competitive ("Need to get within

25").

      c.   DEVRAJ BALBIR

        47.     The defendant DEVRAJ BALBIR regularly communicated with CW-1

and CW-2 via text message to arrange the receipt of bribes, including payments for

renovations to his home.   For example:

        48.     On or about May 3, 2017, BALBIR and CW-1 had the following

exchange:

    BALBIR:     What's up with this electrician?   Need him here…
    BALBIR:     What's your guys (sic) number?...

---

[9] CW-1 informed agents that MCCRANN showed CW-1 a spreadsheet in connection with
this project.   However, the information contained in the spreadsheet was not actually useful
in the Contractor's bid preparation and related to additional work MCCRANN thought would
be lucrative.   CW-1 understood this information was provided by MCCRANN in an attempt
to obtain additional work for the Contractor from the Company for which MCCRANN could
solicit payments.

CW-1:     I'll call him now…I thought he had someone else lined up.
BALBIR:   No, doesn't sound like it and we're ready for him at this point.
CW-1:     Ok I'll take care
CW-1:     of
BALBIR:   my man

49.   Around the same time, CW-1 received the following text message from another individual regarding BALBIR.

Individual:   Hey [CW-1] you can have the electrician do the work at Dev's house.   If you want to give me his contact I will call him.

50.   Shortly thereafter, CW-1 sent a text message to an electrician (the "Electrician"), advising the Electrician, in sum, substance and part, to proceed with work at BALBIR's residence.   A review of records obtained during the course of the investigation reflected the Electrician having submitted invoices to the Contractor for more than $10,000 in electrical worked performed at BALBIR's residence in 2017 and 2018.

51.   As part of the investigation, the Electrician was interviewed and confirmed s/he had performed work at the residence of BALBIR.   When performing work for the Contractor, the Electrician typically received work assignments from CW-2. However, on one occasion, the Electrician received a call from CW-1.   During the call, CW-1 instructed the Electrician to provide an estimate for work to be performed at a house in Long Island, New York, later identified as the residence of BALBIR.   The job included providing power to the back yard of the residence.   The Electrician ultimately met BALBIR at the house.   BALBIR described to the Electrician the work BALBIR wanted performed. While at the house, the Electrician noticed other employees of the Contractor performing work, including landscaping and plumbing for BALBIR.

52.     Sometime later, the Electrician was at a Company job site in Brooklyn. While at the site, the Electrician saw BALBIR.   The Electrician had not realized BALBIR was an employee of the Company until the Electrician saw BALBIR at the Brooklyn site. The Electrician greeted BALBIR but BALBIR seemed hesitant to respond.

53.     On or about August 25, 2017, BALBIR sent a text message to CW-2 identifying a "Punch list" of items BALBIR expected the Contractor to address at BALBIR's home, as follows:

> Concrete Cracked
> Grass SOD [sic] my property
> Chimney needs to be done
> Side and back of house needs to be done
> Backyard pavers
> Sprinklers
> Roth [sic] iron on front patio

54.     Based on the above, I believe BALBIR expected the Contractor to provide the materials needed, arrange for the work to be performed, and pay for the items listed on the "punch list".

55.     On or about August 29, August 30, and September 19, 2017, BALBIR and CW-2 had the following text message exchange:

| | |
|---|---|
| BALBIR: | Need a split unit added to that list as well [CW-2]. That would include running the 220V |
| CW-2: | Ok |

                                    ***

| | |
|---|---|
| BALBIR: | And fence.   Forgot that as well. |
| CW-2: | What do u mean? |
| CW-2: | U don't want to do the France (sic) anymore |
| BALBIR: | No I forgot I need a fence as well |
| BALBIR: | Didn't have that in the list |
| CW-2: | Ok |

                                    ***

| | |
|---|---|
| BALBIR: | Did you order the fence ? |

CW-2:        Didn't know u picked a fence out
BALBIR:      Privacy .. tan colored .. we spoke about it

56.     The following month, on or about October 17, 2017, BALBIR

forwarded to CW-2, via text message, an invoice, dated October 10, 2017, from a fencing

company.

57.     Based on the above, I believe BALBIR was again identifying items at

his residence he expected the Contractor to pay for including a heating or cooling unit ("a

split unit") and a fence ("I need a fence as well").

58.     A review of financial records obtained during the investigation revealed

the Contractor paid more than $100,000 to one of its regular sub-contractors ("Sub-

Contractor-2") for work performed at BALBIR's residence between 2017 and 2018.   The

financial records include checks written from the Contractor's bank account which contain

memo entries identifying BALBIR's address.   When interviewed, Sub-Contractor-2

confirmed s/he performed work at BALBIR's residence which was paid for by the

Contractor.

59.     In addition, on or about September 20, 2017, an approximately $2

million "Work Authorization" for a window-replacement and façade-repair project in

Brooklyn, New York was approved by the Company for the Contractor.   The Work

Authorization was approved by BALBIR, identified as the "Senior Project Manager" for

Facilities, Assets, and Project Management, and another employee identified as a

Procurement Representative.   The Work Authorization was countersigned by CW-1.   The

performance period of the Work Authorization was September 2017 to July 2018.

60.     Similarly, on or about January 9, 2018, an approximately $1.5 million Work Authorization for canopy repairs and building encapsulation at the same location in Brooklyn, New York was approved by the Company for the Contractor.   The Work Authorization was also signed by BALBIR and a Procurement Representative for the Company and countersigned by CW-1 for the Contractor.   The performance period of the Work Authorization was January 2018 to March 2019.   Notably, as described above, during 2017 and 2018, the Contractor paid tens of thousands of dollars in bribes to BALBIR in the form of work performed at BALBIR's personal residence.[10]

61.     In addition to having solicited things of value directly from the Contractor, BALBIR also attempted to have the Contractor inflate a bill the Contractor submitted to the Company to facilitate a bribe payment.

62.     On or about September 28, 2020, BALBIR met with CW-1 at the Contractor's office, located in Long Island, New York.   Prior to the meeting, the Contractor provided BALBIR with a change order which requested $1,008,312 from the Company for work performed by the Contractor.   During the meeting, which was recorded by CW-1 at the direction of the FBI, BALBIR provided a copy of a change order to CW-1.   However, the copy of the change order provided by BALBIR contained handwritten notes which indicated CW-1 should inflate the amount request to $1,088,312 instead of $1,008,312 – adding $80,000 to the amount the Contractor was seeking from the Company.   Based on the investigation to date, I believe BALBIR was directing the Contractor to inflate the change order by $80,000 to facilitate the payment of a bribe to BALBIR.

---

[10]     The investigation has also identified instances in which the Contractor participated in competitive bid processes for work with the Company and was not awarded the work.

d.   RICARDO GARCIA

63.     The defendant RICARDO GARCIA regularly communicated with CW-2 to arrange the payment of bribes through the purchase of personal items using credit cards issued in the Contractor's name and paid for by the Contractor.   For example:

64.     On or about September 12, 2017, GARCIA and CW-2 had the following text message exchange:

GARCIA:     Hey Bro … hope all is well … can I use the card for $1500?
CW-2:        Yea no problem
GARCIA:     Ok .. thank you

65.     On or about October 23, 2017, GARCIA and CW-2 had the following text message exchange:

GARCIA:     [CW-2], can I use the card ending in 0420?
CW-2:        Not sure let me check we had to cancel one the other day for fraud
GARCIA:     Really … dam … ok
CW-2:        How much did u need to put on it that card is ok
GARCIA:     2k
CW-2: Ok
GARCIA:     Ok thanks

66.     A review of financial records obtained during the investigation reveals that the Contractor paid various personal expenses for GARCIA.   Notably, in or about and between August 2015 and April 2019, the Contractor made payments of college tuition totaling more than $30,000 for a family member of GARCIA.

67.     On or about February 25, 2018, GARCIA sent CW-2 a text message which read: "[CW-2], below is the information for the Dubai trip."   The message included images of airlines reservations for two individuals in April 2018 from Newark to Dubai in the amount of $4,451.04 and hotel reservation information for a ten-night hotel stay in Dubai for two individuals at the cost of $1,934 per person.

68.     Based on the above, I believe GARCIA was asking CW-2 to pay for GARCIA's personal travel to Dubai.   Records obtained during the investigation reveal various personal travel expenses were paid by the Contractor on behalf of GARCIA, including this travel to Dubai.

69.     GARCIA also exchanged text messages with CW-2 relating to cash bribes he sought from the Contractor.   For example:

70.     On or about November 14, 2017, GARCIA and CW-2 had the following text message exchange:

GARCIA:     With [family member] and didn't want to ask you with her next to me.. can you bring 3500 when you come on Thursday
CW-2:        Ok no problem
GARCIA:     Ok tsk [sic]

Based on the above, I believe GARCIA was asking CW-2 to provide a cash bribe payment in the amount of $3,500.   Both CW-1 and CW-2 confirmed having paid GARCIA cash bribes.

e.   JEVAN SEEPAUL

71.     The defendant JEVAN SEEPAUL regularly communicated with CW-1 and CW-2 to arrange the receipt of cash and other bribes.   SEEPAUL also has facilitated bribe payments for both himself and BALBIR via text message.

72.     For example, on or about February 15, 2017, SEEPAUL and CW-1 had the following text message exchange:

SEEPAUL:   Did you guys meet with Dev
CW-1:        Yes this morning all good
SEEPAUL:   Ok I had to talk to him
CW-1:        Yeah lk [sic] he was weird… phones had to be off
SEEPAUL:   Wanna make sure no other companies come in
SEEPAUL:   He's paranoid
CW-1  :      Yes ik [sic] he's nuts
CW-1:        We don't need competition

SEEPAUL:     Ok so I'm making sure he's putting in fluff for us all
CW-1:        Ok

73.     Based on the above, I believe SEEPAUL was inquiring about a meeting between CW-1 and BALBIR ("Dev").   I further believe that SEEPAUL was communicating that BALBIR was concerned about the meeting being surveilled or overheard ("he was weird… phones had to be off").   I further believe CW-1 was indicating his desire for the Contractor to avoid any competition for Company's work ("[w]e don't need competition"). I also believe that SEEPAUL was indicating his agreement with this idea ("ok") and was further indicating his intent to work with BALBIR to ensure the proposed work include enough funds so that CW-1 could make bribe payments to BALBIR and SEEPAUL   ("so I'm making sure he's putting in fluff for us all").

74.     On or about June 8 and June 11, 2017, SEEPAUL and CW-1 had the following text message exchange pertaining to a cash bribe:

SEEPAUL:     If you could hit me off with something I'd appreciate it.
             Leaving for Thailand Tuesday.
CW-1:        I'll try to get something by weekend

***

CW-1:        Where you at?   Got something
SEEPAUL:     Can we meet tomorrow
CW-1:        In am early or pick up from my house in [town where CW-1's house
             was located]
SEEPAUL:     Time
SEEPAUL:     I'll pick up in box
SEEPAUL:     [town where CW-1's house was located]
CW-1:        [CW-1's home address provided]
CW-1:        Garage [CW-1's garage door code provided]
SEEPAUL:     Cool

***

SEEPAUL:     I got it thanks
CW-1:        Np

75.     Based on the above, I believe SEEPAUL was seeking a bribe payment from CW-1 in advance of travel ("If you could hit me off with something, I'd appreciate it").[11]   I further believe that CW-1 arranged for SEEPAUL to pick up cash at CW-1's residence ("pick up from my house") and SEEPAUL subsequently confirmed his receipt of the funds ("I got it thanks").

76.     On or about August 22, 2017, SEEPAUL sent the following text message to CW-2: "[d]id [Contractor representative] order the fence for my place?"

77.     Based on the above, I believe this text message related to SEEPAUL's request for the Contractor to pay for fencing at SEEPAUL's residence.

78.     On or about September 1, 2017, SEEPAUL sent a text message to CW-1 which read, in relevant part: "Hope you enjoy the weekend. I wished that I could have hosted something, but it seems there's an issue with [Sub-Contractor-2] and you.   Hopefully my yard can be finished and I won't have to send this uncomfortable message again.   Enjoy the weekend and stay safe."

79.     The day before, on August 31, 2017, Sub-Contractor-2 sent a text message to CW-1, stating "Can you please cut a chck [sic] for 20 for Jev's.   I want to finish the backyard up…"

80.     Based on the above, I believe SEEPAUL was complaining that Sub-Contractor-2 had failed to complete work at SEEPAUL's ("Jev's") residence in the time frame sought by SEEPAUL due to an issue between CW-1 and Sub-Contractor-2, likely a

---

[11]     Travel records obtained during the investigation reflect that on June 13, 2017, SEEPAUL traveled from the United States to Doha, Qatar, returning on June 25, 2017.   I have confirmed Doha is used as a stopover for U.S. airline passengers en route to Thailand.

failure of CW-1 to pay Sub-Contractor-2.   A review of financial records revealed that, on or about September 5, 2017, a check for $20,000 was written from a bank account of the Contractor and made payable to Sub-Contractor-2.   The memo line of the check contained a reference to SEEPAUL's home address.   Additional financial records obtained during the investigation revealed the Contractor paid Sub-Contractor-2 approximately $100,000 for work performed at SEEPAUL's residence during 2017, including the $20,000 check referenced above.

V.      BALBIR's Attempt to Obstruct the Investigation

81.      Beginning in or about January 2020, a federal grand jury sitting in the United States District Court for the Eastern District of New York began investigating various employees and former employees of the Company in connection with the potential bribery and extortion scheme described herein.

82.      On or about October 15, 2020, FBI special agents conducted a voluntary interview of the defendant DEVRAJ BALBIR outside BALBIR's residence in Long Island, New York.   During the interview of BALBIR, the agents asked him questions about the Company and the Contractor.

83.      Two days after the interview, on or about October 17, 2020, the defendant DEVRAJ BALBIR attempted to tamper with CW-1 by, among other things, encouraging him to not cooperate with law enforcement agents and to provide a false explanation about the true source of funds used to pay for work performed at BALBIR's residence.   The conversation was recorded by CW-1 at the direction of the FBI.   During the meeting, BALBIR requested that CW-1 lift CW-1's shirt and turn in a circle to see if CW-1 was wearing a recording device.

84.     Based on the above, I believe that the defendant DEVRAJ BALBIR

was enlisting CW-1's assistance in obstructing federal investigators by requesting that CW-1

provide false information to investigators.

## CONCLUSION

WHEREFORE, your affiant respectfully requests that arrest warrants be issued

for the defendants RICHARD ZAVADA, PATRICK MCCRANN, DEVRAJ BALBIR, also

known as "Dev," RICARDO GARCIA," also known as "Rick," and JEVAN SEEPAUL, so

that they may be dealt with according to law.    I further request that this affidavit and the

arrest warrants be filed under seal as disclosure of this application would give the targets of

the investigation an opportunity to destroy evidence, change patterns of behavior, notify

confederates and flee from or evade prosecution.

KENNETH HOSEY
Special Agent, Federal Bureau of Investigation

Sworn to before me this
14th day of June, 2021
15

*Marcia M. Henry*

THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK